DECISION
{¶ 1} Relator, Pilkington North America, Inc., commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate that portion of its allowance order imposing liability for the claim upon relator as a *Page 2 
self-insured employer, and to enter an order imposing claim liability solely upon the state insurance fund.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate determined the commission abused its discretion in applying the last-injurious-exposure rule to determine risk liability where the rule was not needed nor used to determine the claimant's right to participate. Accordingly, the magistrate determined a writ should be granted.
 {¶ 3} The commission filed three objections to the magistrate's decision:
 OBJECTION NO. 1
 The magistrate erred in holding that last injurious exposure rule was limited to questions of whether the claimant had a right to participate.
 OBJECTION NO. 2
 The magistrate erred by recommending a limited writ of mandamus on the basis that the last injurious exposure rule was not applicable in an assessment of liability between the employer's self-insured risk and the employer's state fund risk.
 OBJECTION NO. 3
 The magistrate erred in finding that the last injurious exposure rule was unwarranted in this case and ordering the commission to allocate liability between the self-insured and state fund risks of the employer.
The commission's objections largely reargue those matters adequately addressed in the magistrate's decision, and for the reasons set forth in the decision, the objections are *Page 3 
unpersuasive. Because the objections are interrelated, we address them jointly. Together they assert the commission properly applied the last-injurious-exposure rule to allocate risk liability to relator as a self-insured, not state-fund, employer.
 {¶ 4} In State ex rel. Erieview Metal Treating Co. v. Indus.Comm., 109 Ohio St.3d 147, 2006-Ohio-2036, the Supreme Court of Ohio refused to apply the last-injurious-exposure rule, explaining that "[t]hus far, this theory has appeared before Ohio courts in just one context: before allowance of a claim, in a situation involving several potentially liable employers. * * * It always involves a worker who has been exposed to the injurious substance while working for each of several employers. When that worker filed a workers' compensation claim, a question arises: When multiple employers have subjected the worker to the hazard, against which employer should the workers' compensation claim be allowed?" Id. at ¶ 9.
 {¶ 5} Here, the claimant's claim has been allowed, he has received workers' compensation benefits and the case involves a single employer, albeit an employer that was state-fund at one point in time and self-insured at another. Because the facts do not involve claim allowance with multiple employers, the single context in which the Supreme Court has applied the last-injurious-exposure rule, the magistrate appropriately concluded the commission wrongly employed the rule to allocate risk liability to the employer at a time it was self-insured rather than a state-fund employer. As the magistrate explained, "[t]he last-injurious-exposure rule was not used, nor was it needed, to assist the claimant in establishing the liable employer to support the allowance of his industrial claim." (Magistrate's Decision, ¶ 42.) Given the Supreme Court's statement in Erieview that the rule has been applied in a single context, and absent some indication from the Supreme *Page 4 
Court that it intends to apply the rule beyond those situations where allowance of a claim is at issue, we decline the commission's invitation to employ and extend the last-injurious-exposure rule to allocate risk liability.
 {¶ 6} The magistrate thus returned the matter to the commission to allocate risk liability. In that regard, relator also filed an objection:
 THE MAGISTRATE ERRED IN REFERRING THIS CLAIM BACK TO THE COMMISSION FOR AN AMENDED ORDER RATHER THAN ORDERING THE COMMISSION TO ASSIGN THE CLAIM ENTIRELY TO THE STATE FUND.
Relator contends the risk liability should have been allocated to the state fund. Relying on Dr. Gad's reports, relator contends the only evidence indicates the exposure occurred prior to December 7, 1970, when relator was not self-insured.
 {¶ 7} The evidence of record, however, contains the First Report of Injury Form. In it, the applicant was asked to describe the events that caused the disease. In responding, claimant stated, "I was employed by Libby-Owens-Ford in Rossford for 41 years from 1947 to 1988. During those years, I worked as a laborer, furnace tender, and crew leader.I was exposed to asbestos in many forms in different environmentsthroughout the plant over my 41 years of employment." (Emphasis added.) (Magistrate's Decision, ¶ 18.) Accordingly, even if Dr. Gad's report supports relator's position, claimant's statement suggests exposure beyond December 7, 1970. Given that the latency period, according to Dr. Gad, may be as short as 20 years, the magistrate appropriately determined the matter should be returned to the commission to consider allocation of risk liability. For the foregoing reasons, the commission's three objections and relator's single objection are overruled. *Page 5 
 {¶ 8} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we grant a writ of mandamus that orders the commission to vacate that portion of its staff hearing officer's order of June 6, 2005, that allocates 100 percent of the risk liability to relator's self-insured status based upon the last-injurious-exposure rule, and to enter an amended order consistent with the magistrate's decision that appropriately determines allocation of risk liability.
Objections overruled; writ granted.
 BROWN and McGRATH, JJ., concur. *Page 6 APPENDIX A MAGISTRATE'S DECISION IN MANDAMUS {¶ 9} In this original action, relator, Pilkington North America, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate that portion of its allowance order imposing liability for the claim upon relator as a *Page 7 
self-insured employer, and to enter an order imposing claim liability solely upon the state insurance fund.
Findings of Fact:
 {¶ 10} 1. Relator, who is a self-insured employer under Ohio's workers' compensation law, is the successor company of Libbey-Owens-Ford Company ("LOF"). Effective December 7, 1970, LOF became self-insured. Relator succeeds to the liability of LOF self-insured claims. Prior to December 7, 1970, LOF was a state-fund employer.
 {¶ 11} 2. On August 4, 2003, respondent Donald F. Stein ("claimant") underwent surgery performed by Joseph Roshe, M.D. In his operative report of that date, Dr. Roshe described the operation as "[r]ight transthoracic resection of large pleural tumor, possibly mesotheliomia."
 {¶ 12} 3. On August 8, 2003, Paul L. Schaefer, M.D., dictated a consultation report regarding the August 4, 2003 surgery. Dr. Schaefer wrote:
 He was taken to surgery and at the time of surgery was found to have a multiloculated, well demarcated mass located primarily at the costovertebral angle. This was dissected. * * * The pathology of this mass reports to be a fibrous, right-sided fibrous pleural mesothelioma, and Medical Oncology consult is obtained for further evaluation and therapy.
 {¶ 13} 4. On November 3, 2003, claimant completed a work history question-naire for the Ohio Bureau of Workers' Compensation ("bureau"). In response to the questionnaire, claimant attached a typewritten sheet stating that he had worked as a general laborer for LOF from February 12, 1947 to 1973 at the "Thermopane Plant 9 Rossford Ohio." The attachment further states that claimant worked for LOF from 1973 to January 31, 1988 at the "Rossford Plant 6." The job at the Rossford Plant 6 is described *Page 8 
in typed print as follows: "Load Unload Furnace — Work on Top of furnace — Group leader Silk Screen."
 {¶ 14} Beside the above-noted typed print, is the following handwriting: "asbestos is in air from furnaces + glass[.] Make adjustments on top of furnaces + no ventilation or protection."
 {¶ 15} Below the above handwriting, the attachment states in typed print: "Frin [sic] 1973 until 1988 is when I was exposed to asbestos in furnaces."
 {¶ 16} 5. On January 3, 2005, pathologist Douglas A. Pohl, M.D., Ph.D., wrote:
 Mr. Stein is an unfortunate man who presented to medical attention in 1990 with radiographic evidence of a large pleural-based mass arising in the right chest. A right thoracotomy was undertaken revealing a solitary fibrous tumor of the pleura (benign fibrous mesothelioma). Mr. Stein experienced a recurrence of his pleural tumor in 1998 and again in 2003. In my review of the pathology slides of one of these subsequent resections, it is my opinion that Mr. Stein's tumor is a malignant fibrous mesothelioma of the pleura.
 The cell of origin of malignant fibrous mesothelioma of the pleura is still debated. An origin from mesothelial cells, like malignant pleural mesothelioma, or submesothelial fibro-blasts has been suggested. In Mr. Stein's case, it is likely that a mesothelial cell or submesothelial fibroblast of the right chest wall underwent a malignant change resulting in uncontrolled growth of that cell and the formation of a pleural based mass. Mr. Stein's malignant fibrous mesothelioma has repeatedly recurred indicative of its malignant nature. Mr. Stein's long term prognosis is uncertain.
 Malignant pleural mesothelioma is known to arise as a result of past asbestos exposure. Studies of malignant fibrous mesothelioma have been hampered by the extreme rarity of this entity, representing only 5% of all primary pleural neoplasms. Thus, epidemiologic studies have lacked sufficient statistical power to assess the potential causes of malignant fibrous mesothelioma. Nevertheless, published case reports and case series have consistently shown that cases of *Page 9 
malignant fibrous mesothelioma occur in patients with significant past asbestos exposure, indicating a role of asbestos in the etiology of this malignancy.
 It is reasonable that asbestos plays a role in the develop-ment of malignant fibrous mesothelioma. Transmigration studies by Sebastein et al demonstrated that inhaled asbestos fibers readily migrate to the pleura from the lungs. Other studies by Wagner demonstrated that the instillation of asbestos fibers in the pleura of animals could produce malignant mesothelioma and fibrous tumors of the pleura. These and other studies led to the understanding that asbestos fibers deposited in the pleural space were capable of inducing a mutagenic event in a mesothelial cell. Since asbestos was the only carcinogen capable of gaining access to the pleural space, it was plausible that asbestos is the principal carcinogen in the causation of mesothelioma, as well as malignant fibrous mesothelioma.
 Mr. Stein's asbestos exposure occurred while he worked for Heinz from 1940 until 1947 and then for Libby Owens Glass Company from 1947 until 1988. The medical records indicate that Mr. Stein was exposed to substantial amounts of asbestos dust during his work career. In view of the well-documented cause and effect relationship between asbestos exposure and mesothelioma, and the reported cases of malignant fibrous mesothelioma among asbestos exposed workers, it is my opinion, within a reasonable degree of medical certainty, that Mr. Stein's asbestos exposure was a substantial contributing factor to the development of his recurrent malignant fibrous mesothelioma of the pleura.
 {¶ 17} 6. On March 21, 2005, claimant filed a First Report of an Injury, Occupational Disease or Death ("FROI-1") form. On this form, claimant alleged that on August 4, 2003, he was diagnosed with "malignant fibrous mesothelioma due to asbestos exposure." Dr. Roshe was listed as the physician of record. The form asks the applicant to describe the events that caused the disease. In response, claimant stated:
 I was employed by Libbey-Owens-Ford in Rossford for 41 years from 1947 to 1988. During those years, I worked as a laborer, furnace tender, and crew leader. I was exposed to *Page 10 
asbestos in many forms in different environments throughout the plant over my 41 years of employment. I am a non-smoker.
 {¶ 18} 7. Relator obtained a report from Michael K. Riethmiller, M.D., J.D., dated April 25, 2005. In that report, Dr. Riethmiller states:
 * * * [I]t is my opinion that the appropriate diagnosis for Mr. Stein's tumor was a solitary fibrous tumor of the pleura with progression to a sarcoma which would be a malignant change. I don't believe that Mr. Stein has a diagnosis of malignant fibrous mesothelioma.
 * * *
 * * * Mr. Stein did not have a malignant fibrous mesothelioma but instead had a solitary or localized fibrous tumor which was initially diagnosed in 1990 and then by 2003 had developed some malignant changes. There isn't any evidence that this tumor is associated with asbestos exposure. Although Dr. Pohl provided an opinion that this tumor is causally connected to asbestos exposure, he didn't provide specific scientific evidence or used evidence associated with a malignant mesothelioma. The fact that asbestos fibers can migrate to the pleura doesn't auto-matically mean that every tumor of the pleura would be caused by asbestos exposure. * * *
 {¶ 19} 8. Following an April 28, 2005 hearing, a district hearing officer ("DHO") issued an order that disallowed the claim. The DHO relied upon Dr. Riethmiller's April 25, 2005 report.
 {¶ 20} 9. Claimant administratively appealed the DHO's order of April 28, 2005.
 {¶ 21} 10. Claimant's appeal was scheduled for hearing before a staff hearing officer ("SHO") on June 6, 2005. Prior to the hearing, relator filed a memorandum in which it claimed that, in the event the claim is allowed, the claim should be charged to the state insurance fund rather than to relator as a self-insured employer. *Page 11 
 {¶ 22} 11. According to an affidavit filed by counsel for relator in this action, at the June 6, 2005 hearing, relator submitted a report from Mohammed Adel Gad, M.D., dated April 21, 2005, which Dr. Gad had authored on behalf of another claimant, William Nyers, Jr., who was employed by LOF. Dr. Gad's April 21, 2005 report on behalf of Mr. Nyers states:
 Malignant mesothelioma has a long latency period that may exceed 30 years. Malignant mesothelioma has a latency period that may range anywhere from 20 to 50 years. However, the average latency period is 35 to 40 years. From 1970 to 2002, which is the year in question of the date of injury/disability, there is a 33 year potential latency period. However, from 1955 to 2002, he would have a 47 year latency period. Given that the average latency period is 35 to 40 years, one would think that the exposure that led to this patient's condition most likely occurred before 1970.
 In summary, the most injurious exposure most likely occurred prior to 1970. The latency period is defined as the time of exposure to development of the condition in question which in this case is malignant mesothelioma. Certainly, the medical documentation does support the requested alleged condition and that this condition was caused by his employment at Libby Owens Ford.
 In conclusion, the patient's condition of malignant mesothelioma is related to the patient's employment at Libby Owens Ford. The most injurious exposure as noted above most likely occurred prior to December of 1970 and the reason for this decision is based on the average latency period of 35 to 40 years for development of malignant mesothelioma.
 {¶ 23} 12. Following the June 6, 2005 hearing, the SHO issued an order vacating the DHO's order of April 28, 2005, and allowing the claim. The SHO's order of June 6, 2005 states: *Page 12 
 This Staff Hearing Officer finds that the injured worker contracted an occupational disease in the course of and arising out of his employment. The injured worker was significantly exposed to asbestos materials and has developed a recurrent malignant fibrous mesothelioma of the pleura.
 The Staff Hearing Officer finds the injured worker had substantial exposure to asbestos during the course of his employment with this employer, which is at a much higher level and risk factor then that of the general public.
 In addition, the injured worker testified that he was exposed to high levels of asbestos even into the 70's and early 80's. The injured worker testified that many changes were made in the 70's to help clean up the plant, however, the injured worker was still exposed to asbestos dust of the top of furnaces until the early 80's. The condition which the injured worker has does have an extremely long latency period. However, at 2005, it is still 25 years out from the early 80's for the condition to have developed. Prior tumors were benign. Further, in occupational disease claims the employer who has the liability on the ultimate claim is the employer of last injurious exposure. Since the exposure to asbestos was ongoing into the early 80's, then the Self-Insured Employer, which began in 1970, would be the last injurious exposure employer.
 * * *
 The Staff Hearing Officer authorizes treatment and orders medical bills paid for the allowed conditions herein pursuant to BWC/IC rules and guidelines.
 This order is based upon the report of Dr. Pohl (01/03/2005), the B-reader report, Dr. Mobin (07/18/2003), Dr. Roshe (03/30/1999) and (08/04/2003), the operative note (08/04/2003), and Dr. Daboul (04/09/2002).
 {¶ 24} 13. On June 18, 2005, the SHO mailed an amended order stating that the claim is allowed for "malignant fibrous mesothelioma of the pleura." *Page 13 
 {¶ 25} 14. On June 29, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of June 6, 2005, as amended.
 {¶ 26} 15. On July 8, 2005, relator moved for reconsideration of the SHO's order refusing its administrative appeal.
 {¶ 27} 16. On July 21, 2005, the commission mailed an order denying the motion for reconsideration.
 {¶ 28} 17. On August 2, 2005, relator filed what it called an amended request for reconsideration. In support, relator submitted a report from Dr. Gad dated July 25, 2005, which addressed the claim of claimant. Dr. Gad's July 25, 2005 report states:
 In 2003, the patient developed a malignant mesothelioma. The latency period for development of a malignant mesothelioma is 30 to 45 years per the New England Journal of Medicine, Volume 320, No. 26, Page 1723. As the latency period for development of malignant mesothelioma is 30 to 45 years, most likely this patient's most injurious exposure was before 1970, although in some cases 20 years latency period has been documented. The average latency period would be used in this case and would support the above decision.
 {¶ 29} 18. On August 26, 2005, the commission mailed an order denying relator's August 2, 2005 so-called amended request for reconsideration.
 {¶ 30} 19. On March 10, 2006, relator filed this mandamus action.
Conclusions of Law:
 {¶ 31} The commission, through its SHO, applied the rule of last injurious exposure to, in effect, allocate 100 percent of the risk liability for the allowed industrial claim to relator as a self-insured employer rather than to relator as a former state-fund employer. *Page 14 
 {¶ 32} The primary issue is whether the last-injurious-exposure rule is warranted to determine risk liability where the rule was not needed nor used to determine the claimant's right to participate.
 {¶ 33} Finding that the rule is unwarranted to solely determine risk liability in this situation, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 34} Historically, the last-injurious-exposure rule was at issue inState ex rel. The Hall China Co. v. Indus. Comm. (1962),120 Ohio App. 374, although the term "last-injurious-exposure rule" does not actually appear in that decision. Later, in State ex rel. Burnett v. Indus.Comm. (1983), 6 Ohio St.3d 266, 268, the court had occasion to summarize the holding in Hall China:
 * * * The court therein held that an injurious exposure was a prerequisite to the allowance of an occupational disease claim; and that proof of such exposure with the last employer was a sufficient basis for the award even though other employments may have contributed to the occupational disease.
(Emphasis sic.)
 {¶ 35} Recently, in State ex rel. Erieview Metal Treating Co. v.Indus. Comm., 109 Ohio St.3d 147, 2006-Ohio-2036, at ¶ 9-10, the court had occasion to further explain the so-called "last-injurious-exposure" theory:
 * * * Thus far, this theory has appeared before Ohio courts in just one context: before allowance of a claim, in a situation involving several potentially liable employers. It usually involves a worker who has recently experienced the onset of a long-latency occupational disease such as asbestosis or black lung. It always involves a worker who has been exposed to the injurious substance while working for each of several employers. When that worker files a workers' compensation *Page 15 
claim, a question arises: When multiple employers have subjected the worker to the hazard, against which employer should the workers' compensation claim be allowed?
 The difficulties inherent in this inquiry are obvious. A long-latency occupational disease can take decades to emerge. Once it has, it is often impossible to go back over the years to quantify the amount of exposure at each job or to pinpoint which exposure planted the seeds of eventual disease. These obstacles inspired the last-injurious-exposure concept, which subordinates the practically unattainable scientific accuracy to the next best thing — consistency. As the name indicates, the employer providing the last injurious exposure will be the one against which the workers' compensation claim is allowed.
 {¶ 36} In Erieview, the commission had allocated the entire cost of the permanent total disability ("PTD") award to the claimant's first employer rather than claimant's second employer. The first claim was allowed for occupational asthma and the second claim was allowed for aggravation of pre-existing occupational asthma. All compensation and benefits had been paid in the first claim, with none having been paid in the second claim. The commission allocated the entire cost of the PTD award to the first employer based upon the payment history of the two claims.
 {¶ 37} Finding that the last-injurious-exposure rule was not applicable, the Erieview court, at ¶ 11, explained:
 * * * The question, of course, remains as to whether the last-injurious-exposure principle should be extended to this situation nevertheless, and upon consideration, we find that it should not. Here, it is possible to determine with some degree of accuracy which exposure was responsible for Yakopovich's disability. Substantial disability compensation has been paid in the Erieview claim, as opposed to none in the Meijer claim. There is, therefore, no reason to resort to the last-injurious-exposure theory. *Page 16 
 {¶ 38} Parenthetically, the magistrate notes that Ohio is not the only jurisdiction to have addressed the rule of last injurious exposure. InState Indus. Ins. Sys. v. Jesch (1985), 101 Nev. 690, 696, 709 P.2d 172,176-177, a case cited by the Supreme Court of Ohio in State ex rel.Liposchak v. Indus. Comm. (1995), 73 Ohio St.3d 194, 196, the Supreme Court of Nevada states:
 Simply stated, the last injurious exposure rule in occupa-tional disease, successive-employer cases "places full liability upon the carrier covering the risk at the time of the most recent injury that bears a causal relation to the disability." 4 A. Larson, The Law of Workmen's Compensation § 95.20 (1984). A majority of jurisdictions have adopted the rule in successive-employer occupational disease cases either by statutory or judicial action. Id.
 In an asbestos-related case it could be a tremendous initial task to discover all the employers responsible for the occupational disease. Then it would be necessary to attempt to apportion the amount of exposure which occurred with each employer. A state's workers compensation agency would be excessively burdened and the claimant would suffer a delay in payment of benefits. Larson, supra, at § 95.24. Just such problems prompted the Nebraska Supreme Court to adopt the last injurious exposure rule in asbestos-related cases. The court quoted from an earlier Tennessee case: "[W]e are constrained to so interpret our Workmen's Compensation Law as will best serve the interests of employees who suffer from an occupational disease, rather than attempt an adjustment of their rights in the light of equities that may exist between [successive employers]." Osteen v. A.C. S., Inc., 209 Neb. 282, 307 N.W.2d 514, 519 (1981) quoting Wilson v. Van Buren County, 198 Tenn. 179, 278 S.W.2d 685, 688 (1955).
(Emphasis sic.)
 {¶ 39} As the Erieview court indicates, the primary purpose of the last-injurious-exposure rule is to assist the injured worker in establishing his industrial claim when *Page 17 
multiple employers have exposed him to a hazardous substance known to cause disability.
 {¶ 40} Given the purpose of the last-injurious-exposure rule, its application here is unwarranted.
 {¶ 41} Here, the commission has used the last-injurious-exposure rule solely to support a 100 percent allocation of risk liability to the self-insured employer who had previously been a state-fund employer. The last-injurious-exposure rule was not used, nor was it needed, to assist the claimant in establishing the liable employer to support the allowance of his industrial claim.
 {¶ 42} Applying the last-injurious-exposure rule to select the liable risk in this case creates an artificial "all or nothing" result in the allocation of risk liability in an industrial claim in which the claimant has already been granted the right to participate.
 {¶ 43} Based upon the foregoing analysis, the magistrate concludes that the last-injurious-exposure rule is inapplicable to the allocation issue that confronted the commission.
 {¶ 44} Based upon Dr. Gad's April 21, 2005 report, relator theorizes that the injurious exposure causing mesothelioma more likely than not occurred during the period that LOF was a state-fund employer, i.e., from 1947 to December 7, 1970. Relator's theory is necessarily premised upon Dr. Gad's April 21, 2005 statement that the average latency period is 35 to 40 years for malignant mesothelioma. Dr. Gad's April 21, 2005 statement was presumably before the SHO at the June 6, 2005 hearing.
 {¶ 45} Parenthetically, the magistrate notes that in Dr. Gad's July 25, 2005 report submitted by relator in support of its so-called amended request for reconsideration, Dr. *Page 18 
Gad states that the average latency period is 30 to 45 years for the development of mesothelioma. Thus, we have an inconsistency with respect to Dr. Gad's reports as to the average latency period for mesothelioma.
 {¶ 46} Approximately 32 and one-half years elapsed between the date that relator became self-insured (December 7, 1970) and the date that claimant was first diagnosed with malignant mesothelioma (August 2003).
 {¶ 47} As can be clearly seen, accepting Dr. Gad's April 21, 2005 statement that average latency is 35 to 40 years, relator can theorize that claimant's exposure to asbestos during the period that relator was self-insured does not fall within the average latency period and thus it is more likely that claimant's mesothelioma was caused by an injurious exposure occurring prior to December 7, 1970.
 {¶ 48} However, accepting Dr. Gad's July 25, 2005 statement that average latency is 30 to 45 years, relator's above-noted theory is undermined because claimant's earliest exposure to asbestos while relator was self-insured occurred approximately 32 and one-half years prior to his mesothelioma diagnosis.
 {¶ 49} Accepting Dr. Gad's July 25, 2005 statement that average latency is 30 to 45 years, claimant's injurious exposure causing mesothelioma could have occurred during the period that relator was a state-fund employer as well as during the period that relator was self-insured.
 {¶ 50} Moreover, if we accept Dr. Gad's statement that the latency period range for mesothelioma is 20 to 50 years, relator's theory is further undermined because most of claimant's 18 years of employment under relator's self-insured status occurred 20 years or more prior to the diagnosis. *Page 19 
 {¶ 51} The point of testing relator's theory here is to show that, in fact, it is indeed just a theory as to how one might determine when the injurious exposure causing mesothelioma most likely occurred. Of course, the commission was not required to accept relator's theory based upon Dr. Gad's April 21, 2005 report.
 {¶ 52} It is the duty of the commission to determine an appropriate basis for allocating risk liability. In the magistrate's view, this court should not perform the allocation for the commission.
 {¶ 53} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate that portion of its SHO's order of June 6, 2005, that allocates 100 percent of the risk liability to relator's self-insured status based upon the last-injurious-exposure rule, and to enter an amended order consistent with this magistrate's decision that appropriately determines allocation of risk liability. *Page 1